In re C.P.

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-278-CV

IN THE INTEREST OF C.P. AND S.P., CHILDREN 

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM
 
OPINION
(footnote: 1)

------------

Candy P. appeals from the trial court’s order terminating her parental rights in her children, C.P. and S.P.  As grounds for termination, the trial court found that appellant had

(1) knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being;

(2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being;

(3) had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of family code section 161.001(1)(D) or (E) or substantially equivalent provisions of the law of another state; and

(4) constructively abandoned the children.

See 
Tex. Fam. Code Ann
.
 
§ 161.001(1)(D), (E), (M), (N) (Vernon 2002).

Appellant does not challenge these findings.  Instead, in a single issue, she challenges the factual sufficiency of the evidence to support the trial court’s finding that termination is in the children’s best interest.  We will affirm.

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann. 
§ 161.001 (Vernon 2002); 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  
Tex. Fam. Code Ann.
 §§ 161.001, 161.206(a); 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980).

The higher burden of proof in termination cases alters the appellate standard of factual sufficiency review.  
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002).  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”  
Id
.  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine “whether the evidence is such that a factfinder could reasonably form a firm belief or conviction” that the grounds for termination were proven.  
Id
.  Because appellant does not challenge the trial court’s findings that she violated several 

of the conduct provisions of section 161.001(1), our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of appellant’s parental rights would be in the best interest of C.P. and S.P.  
Id
. at 28.  
Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future; 

(3) the emotional and physical danger to the child now and in the future; 

(4) the parental abilities of the individuals seeking custody; 

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody; 

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and 

(9) any excuse for the acts or omissions of the parent. 

Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976). 

In this case, the record shows as follows.

Desires of the children:
  C.P. and S.P. were eight and six years old, respectively, at the time of trial.  The children seemed happy to see appellant at the visitations she attended, but appellant often failed to attend scheduled visits.  For example, appellant missed scheduled visitations on Valentine’s Day, C.P.’s birthday, and several other dates in the months before the August 2004 trial on termination.  Appellant testified that her missed visits were due to car trouble or being in jail.  The children became so anxiety stricken and upset as a result of appellant’s repeated failures to attend scheduled visits that CPS reduced the number of visits from four times to two times per month.  This seemed to work a little better for both appellant and the children.  But S.P. once banged his head against the wall in anger over appellant’s failure to work at her service plan so that the children could return home. 

Emotional and physical needs of the children now and in the future:
  S.P. has “extreme behavioral problems” that are eased, but not extinguished, with appropriate medications.  S.P. also has “major anger problems” that even his licensed foster parents are having difficulty managing.  Appellant acknowledged that S.P. has “hyperactivity disorder,” but blamed it on his being placed in foster care.  She contended that both C.P.’s and S.P.’s only need was to be with her.  Appellant also testified that she would rather the children be with their biological father, who had relinquished his parental rights, than be adopted, even though she acknowledged that their father probably could not meet their needs because he had so many other children.

The CASA advocate assigned to this case stated in her report that C.P. internalizes her feelings and appears to function best when her surroundings are orderly and structured.
(footnote: 2)  The record shows, however, that appellant’s home was anything but orderly and structured.  Instead, two home visits by CPS case workers revealed dirty children, trash on the floor throughout the home, no running water, a backed-up toilet, feces all over the bathroom floor, toilet, and bathtub, a dog dying on the floor, glass and bottle caps in the yard, and appellant with no way to pay the rent.  CPS also received a referral that C.P. had lice.  Although the children were “laughing and talking and running around” on one of these visits, the case worker believed the children were at risk and had concerns about their care.  Appellant cleaned the bathroom and picked up most of the trash, but only after being instructed to do so by the case worker. School records also showed that C.P. had missed twenty-five days of school during a single school year.  She stated that she went “junking”
(footnote: 3) with appellant when she stayed home from school.  Conversely, appellant testified that she had taken the children junking only three times and that it was after school. 

Emotional and physical danger to the children now and in the future:
  The conditions at home and at school that we have just discussed pose present and future dangers to the children.  In addition, appellant acknowledged that S.P. had “real bad cavities” in his teeth, so she took him to the hospital.  She did not take S.P. to the dentist, however, because she was trying to get Medicaid. Instead, she told a case worker that she had put Orajel on S.P.’s teeth. Further, appellant admitted to shop lifting with her children, and she used illegal drugs and engaged in prostitution, all of which resulted in frequent incarcerations and kept her from being a stable caregiver for her children.  The children’s younger sister, M.N.A., tested positive for cocaine at birth, and appellant has had her parental rights terminated as to three children, including M.N.A., besides C.P. and S.P. 

Despite these problems, appellant persisted in her belief that “everything was fine” and that C.P. and S.P. were removed from her home because she was poor and had once accepted food from a CASA volunteer.  Appellant stated, “as far as me doing something wrong, no, it’s not my fault.  To me it’s a money thing. . . . [t]o take my kids and sell them, adopt them . . . . [j]ust because Mommy is poor.”  She also blamed her cocaine use on CPS, contending that “[y]ou-all drove me to it.”

Parental abilities of the individuals seeking custody:
   Sandy Fernandez, one of appellant’s former CPS case workers, testified regarding her concern about appellant’s lack of ability to meet the children’s disciplinary, educational, and safety needs.  Further, although appellant played and interacted with the children, she did not, according to Fernandez, demonstrate a loving, motherly bond with them.  Fernandez also opined that appellant cannot cope with S.P.’s anger problems. In her opinion, termination of appellant’s parental rights would be in the children’s best interest. 

Christine Patron, appellant’s case worker at the time of trial, testified that appellant’s relationship with C.P. and S.P. was more of a friend-friend relationship than a parent-child relationship.  Patron also testified that appellant was in an ongoing cycle of having her children removed from the home, completing some parts of her service plan in order to get her children back, having the children returned to her, then removed again, and so on.  Patron did not believe anything would change if appellant were given more time; therefore, she opined that termination of appellant’s parental rights would be in the children’s best interest. 

Programs available to assist these individuals to promote the best interest of the children:
  Appellant has an eight-year, extensive history with CPS, and she was in jail again just one week before trial.  Fernandez and Patron testified that appellant consistently refused to work her service plans and that she showed no improvement from the services in which she did participate.  Although C.P. and S.P. were removed from appellant’s home most recently in September 2003, appellant conceded that she did not participate in any task on her service plan until June 2004, two months before the trial on termination began.  The CASA advocate’s report to the trial court states that appellant “has a lengthy history with DFPS
(footnote: 4) during which she has been uncooperative or minimally cooperative, at best.  This Advocate’s direct contact with [appellant] has been limited by her volatile demeanor and unwillingness to communicate.” Appellant’s Medicaid has run out, she has failed to apply for supplemental security income, and she quit therapy because she said it was too stressful for her.  She explained that the therapist only wanted to talk about her children, and she thought the therapy sessions should be about her.  Further, although she had no monthly income from any source, appellant was not interested in help getting a job.  Instead, she preferred junking.  

Plans for the children by the individuals or agency seeking custody; stability of the home or proposed placement:
  DFPS’s plan for the children is adoption.  Patron testified that she believed the children were adoptable and that DFPS was looking for a family that would adopt both of them, possibly along with their older brother, M.A.C., Jr.
(footnote: 5)  Appellant could not articulate a plan except that she wanted her children back.  She did testify, however, that the house she lived in at the time of trial was a nice home and a “big improvement” over the house in which she had lived with the children in 2003, that she had more income, and that the home has running water and food. 

Meanwhile, the record shows that, since the children’s removal from appellant’s home in September 2003 and placement in foster care, significant efforts have been made to address their academic deficits and S.P.’s behavioral and anger problems.  Patron testified that, in addition to his foster parents, therapists were working with S.P. to resolve his anger problems.  The children’s CASA advocate reported that S.P. had been placed in a residential treatment facility in June 2004 due to “excessive behaviors” such as head banging, hitting C.P., knocking down children at school, and being abusive to his foster parents.  He was released after several weeks, and his newly prescribed medications appeared to be effective in lessening his impulsive behaviors.  S.P. had also received much-needed dental work while in foster care. 

C.P. was treated for lice after being place in foster care.  Both she and S.P. were receiving regular academic tutoring in an effort to enable them to work at their respective grade levels.  S.P. was scheduled to repeat kindergarten due to his extreme difficulties in school. 

Having reviewed the entire record, we hold that the evidence is such that a factfinder could reasonably form a firm belief or conviction that termination was in the children’s best interest.  
See C.H.,
 89 S.W.3d at 25, 28.  “While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”  
Id.
 at 26. Accordingly, we overrule appellant’s sole issue and affirm the trial court’s judgment.

PER CURIAM

PANEL F: CAYCE, C.J.; LIVINGSTON and HOLMAN, JJ.

DELIVERED: May 19, 2005

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
The social study report must be made a part of the record.  
Tex. Fam. Code Ann.
 § 107.054 (Vernon 2002).  Therefore, in a bench trial the court may consider the report regardless of whether it was formally introduced into evidence.  
See Chacon v. Chacon,
 978 S.W.2d 633, 636 (Tex. App.—El Paso 1998, no pet.).

3:
Appellant described “junking” as collecting and reselling junk metal and items found at garage sales and in dumpsters.  

4:
The Department of Family and Protective Services.

5:
Appellant’s parental rights in M.A.C., Jr. had been terminated eight months before the trial on termination involving C.P. and S.P.